# The Mobile and Ohio Railroad Company

*v.*

## William Davis.

*Filed at Mt. Vernon October 31, 1889.*

1. Negligence—*railway signal at highway crossing—and herein, what is a "highway."* Section 6 of the "Act in relation to fencing and operating railroads,".approved March 31, 1874, requires the ringing of a bell or blowing of a whistle at the distance of "eighty rods from the place where the railroad crosses or intersects *any public highway,*" etc.: *Held,* the words "any public highway," as here used, are not limited in their signification to the common public roads in the country, but their meaning is broad enough to include streets and roads in incorporated cities and towns.

2. The term "highway" is generic, inclusive of all public ways, and means a public road, which every person, whether an inhabitant or a stranger, has a right to use for passage and traffic. The term will, therefore, include streets in cities, footways or sidewalks, turnpikes, plank-roads and bridges.

3. Same—*negligence as a question of fact.* Whether a railway company failed to ring a bell or blow a whistle when approaching a highway crossing, at which place a train collided with the plaintiff's team, and whether the plaintiff was guilty of a want of ordinary care in attempting to pass over the track, are questions of fact for the jury.

4. New trial—*attorney associating with a juror.* Pending the trial of a cause, after the evidence was closed, but before argument to the jury, the attorney for the plaintiff (who was the prevailing party) was seen drinking and "clinking" glasses, in a public saloon, with one of the jurors trying the case. So far as appeared, the only subject of conversation between the attorney and the juror, on the occasion, was some old litigation in which the juror's wife had been involved, and which had just then been compromised, the same attorney having represented the adverse interest: *Held,* the mere matter of such association, under the circumstances, between the juror and the attorney was improper, and was ground for reversal of the judgment.

Appeal from the Appellate Court for the Fourth District;— heard in that court on appeal from the Circuit Court of Monroe county; the Hon. George W. Wall, Judge, presiding.

Messrs. Lansden & Leek, for the appellant:

The words "public highway," in the statute requiring the sounding of a bell or whistle on a train approaching a crossing, refer only to public roads in the country, and not to streets in the limits of cities and villages. *Cleaves* v. *Jordan*, 34 Me. 9; *Waterford* v. *Oxford Co.* 59 id. 450; *Railroad Co.* v. *State*, 51 Miss. 137. See, also, Starr & Curtis' Stat. chap. 114, secs. 67, 68, 71, 99.

Appellee was guilty of such contributory negligence as to bar a recovery. (*Steves* v. *Railroad Co.* 18 N. Y. 425.) It was his duty to look and listen for a train before attempting to pass over a crossing. *Railroad Co.* v. *Jacobs*, 63 Ill. 178; *Railway Co.* v. *Hatch*, 79 id. 137; *Railroad Co.* v. *Harwood*, 80 id. 88; *Railroad Co.* v. *Damerell*, 81 id. 450; *Railway Co.* v. *Dimick*, 96 id. 42.

The settled doctrine of the courts of this State, supported by a long line of unbroken authority, is, that it is the duty of a person about to cross a railroad track to look and listen for approaching trains, and the neglect of that duty is such gross negligence as precludes all right of recovery in case of collision. *Railroad Co.* v. *Still*, 19 Ill. 499; *Railroad Co.* v. *Dill*, 22 id. 265; *Railroad Co.* v. *Gretzner*, 46 id. 83; *Railroad Co.* v. *Riley*, 47 id. 515; *Railroad Co.* v. *Manly*, 58 id. 300; *Railroad Co.* v. *Jacobs*, 63 id. 179; *Railroad Co.* v. *Lee*, 68 id. 576; *Railroad Co.* v. *Jones*, 76 id. 312; *Railroad Co.* v. *Bell*, 70 id. 102; *Railroad Co.* v. *Van Patten*, 64 id. 516; *Railroad Co.* v. *Damerell*, 81 id. 455; *Railroad Co.* v. *Hicks*, 13 Bradw. 407.

The court should have granted a new trial on the ground of the conduct of appellee's counsel with the juror. *Knight* v. *Freeport*, 13 Mass. 218; *Cottle* v. *Cottle*, 2 Greenl. 140; *Lyons* v. *Lawrence*, 12 Bradw. 531; *Martin* v. *Morelock*, 32 Ill. 485.

Mr. William Winkelman, for the appellee:

The statute (chap. 131, sec. 1, subdiv. 16,) provides, that the word "highway," "road" or "street" "may include any road

laid out by authority of the United States, or of this State, or of any town or county of this State," etc. Again, we contend that a public street in a town or city, open for pedestrians, is a public highway as much as a highway in the country.

In Shearman & Redfield on Negligence, (p. 408, sec. 343,) the authors say: "The term 'highway' is a generic phrase, inclusive of all public ways, it being defined to mean a public road or thoroughfare which every person has a right to use. The term will, therefore, include streets in cities," etc. See the many authorities cited in note.

The Supreme Court of Indiana says: "A public street in a town is a public highway." *State* v. *Mathis*, 21 Ind. 278.

The Supreme Court of Michigan says: "The streets of Detroit are public highways, like all other roads." *City of Detroit* v. *Blackly*, 21 Mich. 84.

The Supreme Court of Massachusetts says: "In the statute of 1786, (sec. 7,) giving double damages for an injury received through a defect in any highway, the term 'highway' includes townway." *Jones* v. *Inhabitants of Andover*, 6 Pick. 58; *Davis* v. *Smith*, 130 Mass. 113; *Railroad Co.* v. *Dunn*, 78 Ill. 197.

To the last point made by counsel for appellant, upon which they ask reversal of the judgment, we deem it a sufficient answer to say, that it appears from the affidavits of Winkelman, Allen and Burroughs, that the act of touching glasses was by mere accident. (Hilliard on New Trials, p. 202, chap. 10, sec. 6.) And if the act done was a mere accident or inadvertence, without any improper design, and if it can be safely assumed that it had no improper influence on the mind of the juror, there can be no just or reasonable ground to disturb the verdict. (*Vaughn* v. *Dotson*, 2 Swan. 348.) Accordingly, it has been held that the casual treating of a juror by the prevailing party, or one in his employ, without any design to bias or influence him, where there is no cause to believe that the juror was influenced by the occurrence, is not a ground for a new trial. Hilliard on New Trials, p. 204, chap. 10, sec. 8.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

This is an action on the case, brought in the Circuit Court of Monroe County by the appellee against the appellant Company, to recover damages for personal injuries, and for injuries to personal property, as hereafter stated. The trial below resulted in verdict and judgment in favor of the plaintiff, and the Appellate Court has affirmed the judgment of the Circuit Court. The case is brought here by appeal from the Appellate Court.

The declaration avers in substance, that, on June 15, 1886, the plaintiff was riding in his wagon drawn by a pair of mules along the public highway from the town of Columbia in Monroe County to the town of Centerville in St. Clair County, and, while crossing the railway track of the defendant at the point, where such track crosses the highway in the incorporated town of Columbia, his team was struck by a passing train; that plaintiff was thrown from the wagon and received severe bodily injury; that the wagon was so broken and injured as to be useless; that one of the mules was killed, and the other had one of his legs broken, etc.; that plaintiff was using all reasonable care and diligence to avoid an accident; that the injuries resulted from the negligence and carelessness of the servants of the defendant in control of the locomotive and train, in not ringing a bell or blowing a whistle at a distance of at least eighty rods from the crossing of the highway, and in not continuing such ringing or whistling until the highway was reached.

*First,* it is claimed, that the charge of a failure to ring a bell or blow a whistle is not sustained by the evidence, and that the plaintiff was guilty of a want of ordinary care. These are questions of fact, and we cannot consider them.

*Second,* the trial court was requested by the defendant to instruct the jury, that section 6 of an "Act in relation to fencing and operating railroads," approved March 31, 1874, (Starr & Cur. Rev. Stat. chap. 114, sec. 68, page 1927) does not ap-

ply to the crossings of railroads with streets within the corporate limits of a city or town, "and that, if it should appear from the evidence that the Centerville road is a street in the town of Columbia, and that the crossing in question is within its corporate limits, then this statute has no application to the case at bar." The court refused to give the instruction, and such refusal is assigned as error.

Section 6 is as follows: "Every railroad corporation shall cause a bell of at least thirty pounds' weight and a steam whistle (to be) placed and kept on each locomotive engine, and shall cause the same to be rung or whistled by the engineer or fireman, at the distance of at least eighty rods from the place where the railroad crosses or intersects *any public highway*, and shall be kept ringing or whistling until such highway is reached."

The words, "*any public highway*," as here used, are not limited, in their signification, to the common public roads in the country, but their meaning is broad enough to include streets and roads in incorporated cities and towns.

Shearman and Redfield, in their work on the Law of Negligence (vol. 2, sec. 333, (4th ed.)), say: "The term 'highway' is generic, inclusive of all public ways, and means a public road which every person, whether an inhabitant or a stranger, has a right to use for passage and traffic. The term will, therefore, include streets in cities, footways or sidewalks, turnpikes, plank-roads and bridges." The statement of the text writers is sustained by numerous authorities. To the same effect, also, are *State* v. *Mathis*, 21 Ind. 278; .*City of Detroit* v. *Blackly*, 21 Mich. 84; *Jones* v. *Inhabitants of Andover*, 6 Pick. 58; *Davis* v. *Smith*, 130 Mass. 113; *State* v. *Wilkinson*, 2 Vt. 480. In the latter case the Supreme Court of Vermont say: "A common street and public highway are the same,' and any way, which is common to all the people, may be called a highway."

In *St. L., V. & T. H. R. R. Co.* v. *Dunn,* 78 Ill. 197, the precise question here discussed did not arise, but it was held that the failure to ring a bell or blow a whistle, as required by this statute, was an act of negligence on the part of a railroad company when one of its trains was crossing a street in the city of East St. Louis. In paragraph 16 of section 1 of "An Act to revise the law in relation to the construction of the statutes," approved March 5, 1874, (Starr & Cur. Stat. chap. 131, page 2331), occurs the following definition: "The word 'highway,' 'road' or 'street' may include any road laid out by the authority of the United States, or of this State, or of any town or county of this State, and all bridges upon the same." In the case at bar, the Centerville road, where the appellee and his property were injured, appears to have been laid out by the authority of the town of Columbia, and is therefore embraced within the statutory meaning of the word "highway."

The case in Mississippi, to which counsel refers us, is opposed to the weight of authority upon this subject. The cases cited from Maine are based upon a statute in that State, which restricts the meaning of the word "highway" to county roads and "county ways," and excludes "town ways." These cases have no application here.

We are of the opinion that there was no error in refusing the instruction asked for.

*Third,* the next error assigned is the refusal of the Circuit Court to grant a new trial for reasons set forth in certain affidavits presented in support of the motion for a new trial. The following are the affidavits:

"Personally appeared before me, the undersigned, clerk of the circuit court of Monroe county, Charles E. Weller, who, being duly sworn, says that he acted as stenographer in reporting the testimony in the above case; that upon the adjournment of the court, at about half-past nine in the evening, at the conclusion of the testimony in the case, he stepped into a saloon immediately opposite the court house in the town of

Waterloo, and there saw the plaintiff's attorney, William Winkelman, standing at the counter of the saloon with one of the jurors engaged in trying the said cause, Thomas Allen by name, knocking their glasses together as though in token of pledge, and then draining their glasses of beer."

"W. H. Horine, Jr., of lawful age, being duly sworn, says that he is the State's attorney for said county of Monroe; that whilst the trial of the above case was in progress, and after the conclusion of the testimony in the case, but before the closing arguments in said cause, about 9:30 P. M. of March 29, 1888, he saw counsel for plaintiff in said cause, William Winkelman, in the saloon on the ground floor of the City Hotel, opposite the court house, in the town of Waterloo, drinking beer with one of the jurors then engaged in trying the above cause, Thomas Allen by name, knocking their glasses together as if drinking to each other's health, or otherwise pledging themselves."

"Albert J. Kunster, being first duly sworn, of lawful age, says he is the proprietor of the drug store adjoining the City Hotel, in Waterloo, opposite the court house; that about half-past nine P. M., of March 29, 1888, he was in the saloon attached to said hotel, and saw William Winkelman, the attorney, and Thomas Allen, a juror, standing together at the saloon counter, facing each other, and clinking together their glasses of beer and talking confidentially together."

William Winkelman, being sworn, testified: "After the adjournment of court I went to Bickelhaupt's saloon. Werner, the attorney for the railroad company, the State's attorney, ex-sheriff Wilson, and some fifteen or twenty other persons, were in the saloon. Some one called me to take a drink; I thought it was ex-sheriff Wilson. I was standing close to the counter, and near me was Thomas Allen. We took the drink, and, turning around, I spoke to Allen on the suit with his wife and Mrs. Rebenock, which had theretofore been compromised. We spoke in a loud voice. We never mentioned the suit of

Davis against the Mobile and Ohio Railroad Company. This was in the evening, after the adjournment of court."

Thomas Allen, being sworn, testified: "I was in Bickelhaupt's saloon. Some man called me—I think it was Wilson—to take a drink. I was standing near Mr. Winkelman, who also drank. There was a touching of glasses, and Mr. Winkelman being nearest to me, we touched glasses, and then spoke about the suit between my wife and Mrs. Rebenock, which had that day been settled. Not a word was said in that conversation or any other about the suit of Davis against the railroad company. Mr. Winkelman was Mrs. Rebenock's lawyer in the suit with my wife. All this we spoke in the saloon. It was in a loud voice, so that it could be heard. I think some fifteen or twenty persons were in the saloon at the time we had this drink. The railroad attorney and his witnesses at court—some two or three of them—were standing close to the counter, —on the south-east corner of the counter,—and could have heard the conversation."

W. S. Burroughs, being sworn, testified: "I am the sheriff of this county. After court had adjourned I walked over to Bickelhaupt's saloon; found several jurors there; was standing close to Mr. Winkelman and Mr. Allen. I invited three or four persons to drink with me, and seeing Winkelman and Allen there, I asked them also. After the drinking I saw Winkelman and Allen were having some conversation in an ordinary tone of voice, and I think it was the old case of Allen against Rebenock. I don't think they referred in any way to the Davis case. In asking Winkelman and Allen to drink with us, I had no purpose in getting them together, and the matter was not from any design on my part. There was nothing unusual in what occurred at the bar."

It appears from these affidavits that the wife of Allen, one of the jurymen, had for some time been engaged in litigation with one Mrs. Rebenock; that the attorney of Mrs. Rebenock in that litigation was also the attorney of the plaintiff in the

suit at bar; that the case of Allen vs. Rebenock was settled and compromised during the trial of the present suit and on that day of the trial, on which the evidence was closed, the next step being the argument of the cause before the jury; that, on the evening of the day, on which such compromise was effected, the husband of one of the parties, while acting as juror in the present case, and the attorney of the other party, while acting as counsel in the trial of the present case, were drinking together and talking about the litigation so compromised.

We cannot know, that the juror, Allen, may not have been influenced by the circumstances detailed in these affidavits. His wife's "old case" against Mrs. Rebenock had been settled that very day, and, while we do not know what the terms of settlement were, yet they must be presumed to have been satisfactory to Allen, as he was "clinking" glasses in a friendly way with the attorney of his wife's opponent. Why was the compromise of this "old case" made while the present suit was on trial? It was highly improper for the juror, Allen, and the attorney of the present appellee, to be drinking together and talking about that old litigation just then compromised, while they were engaged, the one as juror and the other as attorney, in the trial of the case at bar. Their conduct was calculated to create the impression, that the compromise of the "old case" might have some relation to, or bearing upon, the result of the case then pending.

The jury box must be free from improper influences. Any association of any kind by either party, or the counsel of either party, to a cause on trial, with any one of the jurymen, is calculated to give rise to suspicion and uncertainty as to the fairness of the verdict. If the administration of justice is to be kept pure and above reproach, every appearance of a want of impartiality on the part of juries must be discountenanced.

In the present case, Davis and the Railroad Company were each entitled to a fair, and impartial trial of the controversy

between them. The settlement of a long pending law suit may have inspired Allen with such a feeling of gratitude as to bias his judgment as a juror. The sense of obligation for a favor received is a subtle emotion, and often unconsciously dominates the faculties. It is better that a juryman rest under no obligation, nor under any apparent obligation, to either of the parties, upon whose rights he is called upon to adjudicate.

In *Bonnet* v. *Glattfeldt*, 120 Ill. 166, we went just as far as our sense of duty would permit us to go in overlooking such an appearance of evil as is presented by the present record. The warning, which we there gave, seems to have gone unheeded. In that case we said: "There was clear impropriety in this association of the party with the juror. Such appearance is calculated to impair public confidence in the proper administration of the law, which it is so desirable to have prevail, and should always be avoided. In *Stafford* v. *City of Oskaloosa*, 57 Iowa, 748, there was reversal of a judgment solely because of mere association, during the time of the trial, of the counsel of the prevailing party with one of the jurors, where there had been nothing said respecting the case, and the court was satisfied that nothing wrongful was designed or attempted. It was well said in *Bradbury* v. *Coney*, 62 Me. 223, in speaking upon the subject of the interference by a party with jurymen while a cause is pending: 'In the trial of a cause, the appearance of evil should be as much avoided as evil itself.'" (See also *Martin* v. *Morelock*, 32 Ill. 485; *Lyons* v. *Lawrence*, 12 Bradw. 531).

In the case of *Knight* v. *Inhabitants of Freeport*, 13 Mass. 218, the court says: "Too much care and precaution cannot be used to preserve the purity of jury trials. The attempt to influence the jurors in this case was grossly improper, and ought to be discountenanced. It is not necessary to show that the mind of the juror thus tampered with was influenced by this attempt. Perhaps it is not in his power to say whether he was influenced or not. If he was, there was sufficient cause

to set aside the verdict; and if he was not, and the party who has gained the verdict has a good cause, he will still be entitled to a verdict upon another trial. We cannot be too strict in guarding trials by jury from improper influence. This strictness is necessary to give due confidence to parties in the results of their causes; and every one ought to know that for any, even the least, intermeddling with jurors, a verdict will always be set aside."

In *Cottle* v. *Cottle*, 6 Greenl. 140, the Supreme Court of Maine, in speaking upon this subject, says: "It is insisted that the juror was not in fact influenced, and that justice has been done between the parties. It may be so; but it may be useful to the party to learn that a good cause may be injured, but cannot be promoted, by conduct of this sort, and to the public generally, to know that it will be tolerated in no case whatever."

We think that the Circuit Court erred in refusing to grant the new trial, and accordingly the judgments of the Appellate and Circuit Courts are reversed, and the cause is remanded to the Circuit Court.               *Judgment reversed.*